UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.     Case No. 8:21-cv-

$24,630.00 in United States Currency,

    Defendant.

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The United States of America brings this complaint and alleges upon information and belief, in accordance with Supplemental Rule G(2), Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, as follows:

## NATURE OF THE ACTION

1. This is a civil action *in rem* to forfeit to the United States of America, pursuant to 21 U.S.C. § 881(a)(6), approximately $24,630.00 in United States currency seized from Sharrod Devell Holmes, Jr. at the Tampa International Airport (Defendant Funds).

## JURISDICTION AND VENUE

2. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides the Court with jurisdiction over actions to recover or enforce forfeitures.

3. This Court has *in rem* jurisdiction over the Defendant Funds because venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395.

4. Venue is proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1395(b) because the Defendant Funds were found and seized in this district.

## THE DEFENDANT *IN REM*

5. The Defendant Funds consist of approximately $24,630.00 in United States currency seized from Sharrod Devell Holmes, Jr. on March 1, 2021 at the Tampa International Airport by law enforcement officers who determined that there was probable cause to believe that the Defendant Funds constituted (1) money furnished or intended to be furnished by a person in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; or (3) money used or intended to be used to facilitate a violation of the Controlled Substances Act.

6. U.S. Immigration and Customs Enforcement, Homeland Security Investigations (HSI) took custody of the Defendant Funds, and the funds remain in the custody of the United States.

7. As set forth in Supplemental Rule G(3)(b)(i), the Clerk of Court must issue a warrant to arrest the Defendant Funds if they are in the government's possession, custody, or control.

## BASIS FOR FORFEITURE

8.      The Defendant Funds are subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because they constitute: (1) money furnished or intended to be furnished by a person in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; or (3) money used or intended to be used to facilitate a violation of the Controlled Substances Act.

## FACTS

9.      The facts and circumstances supporting the forfeiture of the Defendant Funds have been provided by HSI Task Force Officer Matthew Ewing, who states as follows.

### Holmes' Criminal History

10.     On August 28, 2015, then 18-year-old Holmes was stopped by a law enforcement officer for a traffic infraction in Pinellas County, Florida. The officer smelled marijuana. As a result, the officer searched Holmes and his vehicle. The officer found marijuana and a bag containing approximately 8 grams of cocaine. The amount of cocaine, and the way it was packaged, suggested it was not for Holmes' personal use. Rather the amount and the manner of packaging was consistent with an intent to distribute the cocaine.

11. On November 26, 2015, then 18-year-old Holmes was arrested in Pinellas County, Florida for possessing marijuana. At the time of his arrest, Holmes had $220 in United States currency.

12. On December 22, 2016, a confidential informant accompanied by a law enforcement officer purchased approximately one gram of cocaine from Holmes for $100. The confidential informant knew Holmes as "Gold Mouth." The transaction was conducted in Pinellas County, Florida. Holmes was 19 years old at the time.

13. On June 4, 2017, law enforcement received a tip from a concerned citizen who reported observing a transaction at a Waffle House restaurant in Pinellas County, Florida. While investigating the tip, the law enforcement officer smelled marijuana coming from Holmes and his vehicle. The officer searched Holmes' vehicle and found a plastic baggie containing nine pieces of crack cocaine. Nine pieces of crack cocaine is not a personal use quantity. Holmes was 19 years old at the time.

14. On September 19, 2017, then 20-year-old Holmes was arrested for Fleeing or Eluding a Law Enforcement Officer and Possession of Marijuana in Pinellas County, Florida. After being directed to stop by a deputy sheriff, Holmes fled at a high rate of speed on a street with significant pedestrian traffic, drove on the wrong side of the road, ran red lights, nearly struck numerous civilian vehicles, and crashed in an area where civilians were walking. On the floor of Holmes' vehicle, a law enforcement officer found a bag of marijuana. In October 2017, Holmes was

4

convicted of Fleeing or Eluding a Law Enforcement Officer, a third-degree felony, and Possession of Marijuana. Holmes was sentenced to imprisonment for 180 days.

## Bulk Cash Discovery of February 1, 2021

15. On February 1, 2021, Officer Ewing interviewed then 23-year-old Holmes at Tampa International Airport after Transportation Security Administration (TSA) personnel located a large sum of United States currency while screening Holmes' shoulder Gucci satchel.

16. The currency found in Holmes' satchel was rubber-banded in several small bundles, as depicted below. This is consistent with how drug traffickers and money couriers transport currency.



17. Holmes was booked to travel to Los Angeles, California.

18. California is a known source state for controlled substances. It is common for drug traffickers to transport currency to California, purchase controlled substances once there, and ship the controlled substances back to Florida, and then sell the controlled substances in Florida, or elsewhere.

19. Holmes claimed he was traveling with $25,000 in United States currency, and was going to California to purchase dogs. According to the Florida Department of Economic Opportunity, Holmes has no work history in the State of Florida (the Florida Department of Economic Opportunity administers Florida's unemployment insurance program and keeps records of wages earned in Florida). The fact that 23-year-old Holmes had no work history but $25,000 in United States currency suggests the money was not earned lawfully.

20. Holmes was uncooperative during the brief interview. Holmes stated he did not want to be detained, wanted to board his flight, and did not want to speak with law enforcement.

21. After Officer Ewing explained that Holmes was not being detained by law enforcement, Holmes took his Gucci satchel (with the currency) and left the screening area.

### March 1, 2021 Seizure of Currency

22. Exactly one month later, on March 1, 2021, law enforcement officers were conducting a narcotics interdiction operation at the Tampa International Airport.

23. During the operation, a K9 officer working with his narcotics detection dog was conducting random "sniffs" of persons and their bags at the airport.

24. The officer and his dog are certified as a narcotics detection team. The dog was trained to respond to the odor of cocaine, heroin, marijuana, and methamphetamine.

25. During the interdiction operation, the dog alerted to the odor of narcotics on then 23-year-old Holmes.

26. As a result, law enforcement officers approached Holmes who was immediately agitated that he was questioned by law enforcement. Holmes identified himself with his Florida driver's license which listed his address in St. Petersburg, Florida. Below is a photograph of the home located at that address:



27. Officer Ewing explained to Holmes that the narcotics detection dog alerted to Holmes for narcotics odor. Holmes responded that he smokes cannabis regularly. Holmes denied that he was carrying or transporting any narcotics.

28. Holmes gave consent for law enforcement to search his small, carry-on shoulder satchel that was slung over his shoulder. No drugs or currency was found in the satchel.

29. When asked about his travel plans, Holmes said that he was traveling to Los Angeles, California to purchase French bulldogs for his breeding business.

30. Law enforcement asked if Holmes had personally booked his flight and Holmes said that he did. As will be seen, this was not true.

31. Officer Ewing asked if Holmes was traveling with anyone. Holmes repeatedly insisted that he came to the airport by himself and that he was traveling alone. As will be seen, this too was not true.

32. Holmes told Officer Ewing that he checked a bag for the flight but declined to give law enforcement permission to search his checked bag. At that point, law enforcement left Holmes, who remained at his gate.

33. A short time later, the K9 officer and his dog conducted a sweep of all checked luggage destined for Los Angeles aboard Holmes' flight (American Airlines Flight 316). The K9 officer had no idea which bag belonged to Holmes.

34. The K9 officer's dog alerted to a single bag: a large hard-sided suitcase. The suitcase's baggage tag indicated that the suitcase belonged to Holmes. The bag was seized and maintained in law enforcement custody at the airport police department office. The plan was to seek a search warrant to search Holmes' checked bag.

8

35. Unbeknownst to law enforcement, Holmes witnessed the sweep of the checked luggage and observed the dog alert to his suitcase. Holmes also saw officers take possession of his suitcase. Upon observing the seizure of his suitcase, Holmes decided not to board his flight to Los Angeles. Instead, on his own initiative, Holmes went to the airport police department office.

36. During their initial observation of Holmes, law enforcement saw that Holmes appeared to be traveling with a female who they later identified as Brittany Tatiana Bowman (Bowman). Holmes and Bowman were seen passing through TSA security screening and appeared to be together as they conversed. Within moments of the drug detection dog first alerting on Holmes, Bowman and Holmes parted company and went to separate areas of the terminal. Holmes went and sat at Gate F84 while Bowman went and sat at Gate 87.

37. It was later learned that Bowman was sitting at the gate for American Airlines flight 315 to Phoenix, Arizona, and that she was ticketed to fly to Los Angeles (through Phoenix).

38. The K9 officer and his dog also conducted a sweep of the checked luggage for Bowman's flight—American Airlines flight 315. The dog alerted to a large suitcase. The baggage tag that was attached to the suitcase indicated Bowman was the owner of the suitcase. The bag was seized and maintained in law enforcement custody to be searched if a search warrant was obtained.

39. After seizing Bowman's suitcase, law enforcement went to Gate F87 to locate Bowman. At Gate F87 they were told by an American Airlines gate agent that after the aircraft began to board, Holmes approached the agent and asked if the agent would contact Bowman and tell her not to depart on her flight. After being informed of Holmes' request, Bowman departed the gate and elected not to fly to Phoenix.

40. Law enforcement brought Bowman's suitcase to the airport police department office.

41. At the airport police station, Holmes learned that law enforcement was going to apply for a search warrant to search his suitcase, Holmes reconsidered and consented to the search of his suitcase. He did so orally and in writing after law enforcement explained it was his constitutional right to refuse the search of his suitcase without a search warrant.

42. While interviewing Holmes, law enforcement observed that Holmes was wearing a thick gold chain necklace and bracelet:

 

43. Officer Ewing conducted a pat-down for weapons and observed that Holmes had two large rubber-banded bundles of United States currency in his pants pocket. Holmes said that the amount of each bundle was $2,000 and that the total currency in his pocket was $4,000. Holmes placed the currency back in his pocket after the pat-down was completed.

44. Officer Ewing then conducted a search of Holmes' suitcase. Upon opening the suitcase, Officer Ewing smelled marijuana. During the search, Officer Ewing discovered five large, rubber-banded, bundles of United States currency concealed in the pockets of various pairs of pants.

45. Transporting currency in this manner is a tactic that is often used by drug traffickers.

46. During the search, Officer Ewing also discovered a loaded pistol magazine containing 16 rounds of 9 mm ammunition in the suitcase.

47. Holmes denied knowledge or ownership of the magazine with ammunition. He claimed he did not know how it got in the suitcase. Holmes admitted, however, that he owned the suitcase and that he packed it himself. Holmes also claimed ownership of the currency and stated that he packed the currency in his pants.

48. Officer Ewing asked Holmes if any of the currency had been withdrawn from a bank. Holmes initially denied withdrawing the currency from a bank, but later claimed that "some" of the currency was withdrawn from his account at

Regions Bank. However, Holmes stated he did not conduct online banking, did not use his smart phone to access his bank account, and could not provide any banking records to show the claimed withdrawals from the bank.

49. When asked how he earned the currency, Holmes claimed he earned the money by breeding French Bulldogs. He stated that he had been working in the dog-breeding business for over a year. Holmes claimed he had already applied for, and would be receiving a business license imminently, in the registered company name of "Gucci Kennels."

50. Holmes also stated he earns money by detailing cars for a business identified as "LOE" which was an acronym for "Loyalty Over Everything." Holmes claimed that he and his cousin, whom he refused to identify, earn $20 per vehicle that they detail. He claimed that they detail approximately 10 cars a day. Holmes also stated that he operates this business at his home in St. Petersburg, Florida.

51. Holmes admitted that he has not paid any taxes on his alleged earnings.

52. Later in the interview, Holmes changed his story and stated that he had not actually made any money from breeding dogs "yet." He contradicted his previous statement and claimed that the currency that he was transporting was solely proceeds of his detailing business.

53. Officer Ewing inquired about Holmes' living situation. Holmes advised that he resided with his mother in St. Petersburg, Florida. See paragraph 26 above.

54. Holmes said that he helps his mother with "the bills" but would not provide specifics as far as amounts per month or what financial contributions he makes for his living expenses. He also told officers that he was the father to 6 children.

55. Officer Ewing again asked Holmes about his travel arrangements to Los Angeles, and Holmes continued to claim that he was traveling alone and denied that he arrived at the airport with anyone. He stated that he booked and paid for the airfare himself. He claimed that he booked the airfare personally through Priceline. He also repeatedly claimed that his mother dropped him off at the airport. As will be seen, none of this was true.

56. Holmes advised that he was traveling on a roundtrip ticket and that he was due to return to Tampa less than 24 hours after arriving in Los Angeles. He stated that he intended to purchase the dogs and return immediately. He advised that he had not made any arrangements for accommodations in Los Angeles. Holmes' travel to Los Angeles and return to Tampa in less than 24 hours is a well-documented tactic used by drug traffickers and money couriers. It is common for drug traffickers to transport currency to California to purchase controlled substances, ship the controlled substances back to Florida, and then sell the controlled substances in Florida, or elsewhere.

57. Officer Ewing asked if Holmes could provide any documentation, emails, or text messages to corroborate his claims concerning his earnings and

13

intention to purchase dogs in California. Holmes advised that he could not provide anything to support his claims.

58.    Officer Ewing then retrieved Bowman's suitcase, which had remained secured and out of Holmes' sight throughout the interview. Officer Ewing again asked Holmes if he came to the airport alone, and if he was traveling alone. Upon seeing the suitcase, Holmes admitted that he lied and that he came to the airport with Bowman. He explained that although they were booked on different flights, they were indeed traveling together, and were meeting upon their arrivals in Los Angeles. Law enforcement asked Holmes if Bowman was still at the airport and Holmes stated that she was. Holmes agreed to contact Bowman and have her respond to the office.

59.    Bowman responded a short time later and agreed to speak with the officers. Bowman consented to the search of her luggage and signed a consent to search form giving officers permission to search her suitcase. Law enforcement searched her luggage and found four empty large white padded envelopes, depicted below:



14

60. It is common for drug traffickers to ship controlled substances in envelopes via the U.S. mail or other commercial carriers. The envelopes found in Bowden's luggage smelled like marijuana. Officer Ewing commented on the odor and Bowman said that she smokes "weed" every day.

61. Bowman admitted that she and Holmes were traveling to Los Angeles together, but claimed she did not know the purpose of his travel. She also admitted that she traveled with Holmes to Los Angeles twice previously, most recently on February 22, 2021 (seven days earlier). The related boarding pass and passenger receipt was found during the search of her suitcase. The boarding pass showed that Bowman was ticketed to fly to Los Angeles on February 22, 2021.

62. Law enforcement determined that Bowman was on active probation for fraud. They contacted Bowman's Probation Officer and learned that Bowman did not have permission to leave the county. She was therefore arrested for Violation of Probation.

63. Although Holmes repeatedly claimed that he purchased his airline ticket himself, according to American Airlines the ticket was purchased by "Alicia Grandville."

64. After interviewing Bowman, Officer Ewing resumed the interview of Holmes. Officer Ewing asked if Holmes could provide anything to substantiate his claim that he was transporting the currency for the purchase of dogs. He could not.

Holmes was asked if he was able to provide anything to illustrate that the currency was earned by legitimate means. He said that he could not.

      65.     Officer Ewing explained to Holmes that the currency would be seized for forfeiture.

      66.     During follow up investigation, law enforcement reviewed airport video surveillance footage of Holmes' and Bowman's arrival at the airport. Although Holmes repeatedly claimed throughout the interview that his mother dropped him off at the airport, a review of video surveillance demonstrated that Holmes lied and had driven himself to the airport. The below video surveillance photographs show Holmes entering the airport long term parking garage in a gray-colored Ford Mustang:

 

      67.     Furthermore, Holmes and Bowman remained in close proximity to each other until they completed the screening process, as depicted in the below photographs.

Case 8:21-cv-01767-VMC-CPT   Document 1   Filed 07/21/21   Page 17 of 20 PageID 17

 

68. In view of the fact that Holmes repeatedly lied about traveling with Bowman, it appears that Holmes and Bowden sat in different seating areas in the terminal to hide the fact that they were traveling together. Drug traffickers and money couriers often do this to limit their exposure in the event one of them is encountered, intercepted, or interdicted by law enforcement.

69. The total seized from Holmes was $24,630.00. The currency was mostly wrapped in stacks with rubber-bands and found to be in denominations consistent with street-level drug sales.

**ADDITIONAL INVESTIGATION**

70. On or about October 19, 2016, in Case No. 16-11416-CF filed in the Circuit Court in Pinellas County, Florida, Holmes executed an Application for Criminal Indigent Status stating that he had no income or assets.

71. According to Florida Department of Economic Opportunity records, Holmes has no work history in the State of Florida.

72. According to Florida Department of Economic Opportunity records, Bowman has not had employment in the State of Florida since 2007.

73. For the reasons stated above, including (1) Holmes' criminal history; (2) Holmes' lack of a legitimate source of substantial income; (3) Holmes traveling to a source state for a mere 24 hours; (4) Holmes transporting a large sum of United States currency; (5) Holmes having recently traveled to the same source state with a large sum of currency; (6) Holmes' young age; and (7) Holmes' inconsistent statements and implausible story, probable cause exists to believe that the Defendant Funds are subject to forfeiture to the United States under 21U.S.C. § 88l(a)(6).

74. For the reasons stated above, the Defendant Funds are subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6).

## CONCLUSION

75. As required by Supplemental Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, they support a reasonable belief that the government will be able to show by a preponderance of the evidence that the Defendant Funds are (1) money furnished or intended to be furnished by a person in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; or (3) money used or intended to be used to facilitate a violation of the Controlled Substances Act and are therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff United States of America respectfully requests that this Court issue a Warrant of Arrest *in rem* pursuant to Supplemental Rule G(3)(b)(i) for the Defendant Funds, initiate a process of forfeiture against the Defendant Funds, and duly notice all interested parties to appear and show cause why the forfeiture should not be decreed. The United States further requests that the Court order the Defendant Funds forfeited to the United States for disposition according to law and grant the United States such other and further relief as this case may require.

Dated: July 19, 2021

Respectfully Submitted,

KARIN HOPPMANN
Acting United States Attorney

By: _____
JAMES A. MUENCH
Assistant United States Attorney
Florida Bar Number 472867
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000 – telephone
E-mail: james.muench2@usdoj.gov

## VERIFICATION

I, Matthew Ewing, hereby verify and declare under penalty of perjury, that I am a Task Force Officer with U.S. Immigration and Customs Enforcement, Homeland Security Investigations, and pursuant to 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint for Forfeiture *in Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case together with other HSI Special Agents and Task Force Officers.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Executed this __16__ day of July, 2021.

*Matt Ewing*
_____
Matthew Ewing
Task Force Officer
Homeland Security Investigations